**In re Kevin R. DUPELL, Debtor.**

**Bankruptcy No. 99–10561 DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

July 19, 1999.

John J. Koresko, V, King of Prussia, Counsel for Debtor.

Axel A. Shield, II, Esquire, Caplan & Luber, LLP, Paoli, Counsel for Bank.

Dave P. Adams, Esquire, Office of the U.S. Trustee, Philadelphia, for United States Trustee.

## *OPINION*

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Motion of Crusader Bank, F.S.B. ("Bank") for Relief from Stay (the "Motion") pursuant to § 362(d)(1) or (d)(2) to exercise its state law remedies against certain rental property (the "Property") which Debtor owns and on which Bank holds a mortgage ("Mortgage").[1] For the reasons stated below, the Motion is denied at this time.

---

1. Debtor alleges certain legal defects to the enforceability of Bank's Mortgage, including claims under the Fair Debt Collection Practices Act. The adjudication of these issues is properly the subject of an adversary proceeding which I note has not been commenced as of this date notwithstanding the pendency of this Chapter 11 case for six months. Since I am not granting the relief requested in the Motion, I need not consider what effect, if any, such claim would play in this contested matter. I will, however, direct the Debtor to

## BACKGROUND

On January 5, 1999, Kevin P. Dupell ("Debtor") filed this individual Chapter 11 case. Debtor is the owner of nine rental properties located in Norristown, Pennsylvania, including the Property, a six[2] unit apartment building located on E. Jacoby Street.[3] The $135,000 loan for the Property was made July 15, 1997 and went into default in December 1997. Since that date no payments were made until this bankruptcy was filed on January 15, 1999.[4] Post-petition payments were made for the months of March and April, albeit several weeks late, in the regular monthly amount of $1,467.04. Exhibits D–1 and D–2. As of the hearing, the Bank contended that Debtor had not made his February, May and June post-petition payments. However, the Debtor produced a check dated May 2, 1999 evidencing the May payment, Exhibit D–3, and another dated June 2, 1999, Exhibit D–4, evidencing the June payment.[5] According to Crowley, current arrears are $20,500 although the basis of that calculation was not explained. Crowley also testified that the total indebtedness is $160,000. Presumably both these numbers do not account for the uncredited May and June payments. While the Bank produced no evidence of value, the Debtor's Schedules value the Property at $75,000.

In November or December 1998, Crowley visited the Property as is the Bank's practice when it is planning to foreclose or take action on an assignment of rents. He found the condition of the Property, a converted home, to be poor, noting floors that needed repair and water leaks. He spoke to tenants but not about whether they were paying their rent. Pursuant to the assignment of rents, the Bank sent notices to tenants in late November or early December. While these letters were not made part of the record, the Debtor acknowledged that the notices were received by two of the three existing tenants.[6] At the time three units were vacant and the total monthly rental revenues were $1,210.

file the appropriate action within 20 days. Debtor's plan of reorganization is due July 31, 1999. The promulgation of such plan presumably will be consistent with Debtor's theory about the enforceability of this Mortgage. Absent the prosecution of an action against the Bank, the plan process will be stalled.

2. Debtor also pointed out that the Assignment of Rents incorporated in the Mortgage is a form titled "1–4 Family Rider." Exhibit C–1. The legal consequences, if any, of the use of that form versus some other form were never explored. Accordingly, the title plays no part in my analysis.

3. One of the issues raised by Debtor as a challenge to the enforceability of the Mortgage is the address of the Property. The Debtor testified that the address is 207 E. Jacoby Street. However, the Mortgage recites an address of 209 E. Jacoby. *Id.* The Bank President Joseph Crowley ("Crowley") testified that the address is actually 207–209 E. Jacoby and in any event, the legal description, *i.e.*, metes and bounds, governs. The accuracy of that description is evidenced by the fact that the Bank has title insurance. For the purpose of this Motion, I am persuaded that the Bank's Mortgage is not defective based on the street address reference to 209 E. Jacoby. If Debtor believes he can set aside this Mortgage on these grounds, he is free to raise the issue in the adversary proceeding to be filed.

4. The Debtor had filed a previous case in mid–1998 that he subsequently dismissed.

5. Bank made much of the fact that unlike Exhibits 1 and 2, the copies of the latter two checks failed to include the back of the checks evidencing the actual payment. Debtor testified that he had not received his cancelled checks from Progress Bank so he could not include them. For the purpose of this hearing, I will accept that explanation and assume that the May and June checks will clear. Needless to say if that is not the case, the Debtor has not advanced his cause but merely bought some time as I would expect that the Bank would then be able to prove its position and gain the relief it seeks on a reviewed motion for failure to make post-petition payments.

6. The tenants were Walter Williams, Alisa Jackson and Martha Hill. Debtor claims Williams did not receive the notice but Jackson did. Hill is sending her rental payment to the Bank.

Since then Debtor has been in the process of renovating the units for rental as section 8 housing.[7] The authorities inspected and certified the housing for such use in January or February, and he hopes to be fully rented at $500 for each of the six units by the end of July. There is a plentiful supply of potential section 8 tenants. By the end of June, he expected to receive rents of $2,000 which would be sufficient to cover the costs of operating the Property, including the Mortgage. Exhibit D–5. The rental income, he stated, is necessary for his reorganization plan, contributing 30% of the funding. If he can achieve full occupancy, his monthly income of $3,000 will generate excess revenues over expenses of $900. Without the Property, he states that he "can't make it."

Based on these facts, Bank contends that relief should be granted for "cause, including lack of adequate protection" pursuant to § 362(d)(1). Specifically, it argues that the poor condition of the Property, the failure to make post-petition payments and the poor payment history on the loan support this conclusion. Alternatively, it contends that relief under § 362(d)(2) is warranted as Debtor has not met its burden of proving that the Property is necessary for an effective reorganization.

## DISCUSSION

■ Generally, the decision whether to modify, condition, or annul the bankruptcy stay under Section 362(d) is within the discretion of the bankruptcy court. *See Matter of Holtkamp,* 669 F.2d 505 (7th Cir.1982); *In re Shariyf,* 68 B.R. 604 (E.D.Pa.1986); *In re Colonial Center, Inc.,* 156 B.R. 452, 459 (Bankr.E.D.Pa.1993). The determination is made by examining the totality of the circumstances. *Matter of Baptist Medical Center of New York, Inc.,* 52 B.R. 417, 425 (E.D.N.Y.1985),

*aff'd,* 781 F.2d 973 (2d Cir.1986); *Colonial Center,* 156 B.R. at 459. Section 362(d) allows a creditor to attempt to strike a balance between its rights and the debtor's need for breathing room in order to rehabilitate or liquidate in an orderly manner. *See generally Community Federal Savings and Loan Association v. Craghead (In re Craghead),* 57 B.R. 366, 369 (W.D.Mo.1985).

### I.

■ Relief from stay under § 362(d)(1) may be granted for "cause, including the lack of adequate protection of an interest in property of such party in interest." The party seeking relief from the stay has an initial burden to demonstrate cause for relief. *In re Ward,* 837 F.2d 124, 128 (3d Cir.1988); *In re Purnell,* 92 B.R. 625, 631 (Bankr.E.D.Pa.1988); *In re Kim,* 71 B.R. 1011, 1015 (Bankr.C.D.Cal.1987). This follows from the principle that a party seeking to alter the status quo has some initial burden to justify the relief sought. *See generally In re Fries,* 68 B.R. 676, 684–85 (Bankr.E.D.Pa.1986).

■ Courts in this district have concluded that evidence of a debtor's post-petition default in mortgage payments meets the mortgagee's initial burden of production in establishing "cause" for relief under Section 362(d)(1). *E.g., In re Skipworth,* 69 B.R. 526 (Bankr.E.D.Pa. 1987); *In re Wright, Egan & Associates,* 60 B.R. 806 (Bankr.E.D.Pa.1986); *In re Keays,* 36 B.R. 1016 (Bankr.E.D.Pa.1984). The record establishes that Debtor is in default of his obligation to make the February payment and that certain late charges are also due.[8] Bank also provided evidence that the Property was in poor

---

7. Eighty percent of his prior tenants had to be evicted in January, February and March for non-payment of rent. Section 8 tenants are thought to be a more stable source of revenue. He claims that renovations for accommodating such tenants are 75–80% completed, the units requiring only touch-up painting, carpeting and clean up.

8. The record is not clear whether he was billed for these late charges.

condition.[9] Where a creditor's collateral is depreciating in value or otherwise at risk, cause may exist to lift the stay if adequate protection equal to the value of that depreciation from the time the creditor would have been entitled to exercise its state law remedies is not provided. *United Savings Assoc. v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *Paccom Leasing Corp. v. Deico Electronics, Inc.*, 139 B.R. 945 (9th Cir. BAP 1992).

■ Once the movant meets its burden, as Bank has done here, the burden then shifts to the debtor opposing the relief to establish the absence of "cause." 11 U.S.C. § 362(g). *See generally Nazareth National Bank v. Trina–Dee, Inc.*, 731 F.2d 170, 171 (3d Cir.1984). The debtor may do this by demonstrating that the movant is adequately protected.[10] In this case, the Debtor testified that he has been renovating the apartment units and that they were certified as appropriate section 8 housing after inspection in January or February, sometime after Crowley inspected the Property and found it in poor condition. There is no basis in this record to find that the Bank's collateral is depreciating; rather the opposite appears true. The improvements to the Property provide adequate protection to the Bank. With respect to the post-petition payment default, the Debtor's testimony is that the only missed payment is attributable to February and he is current thereafter. So long as Debtor remains current and provides for the curing of the post-petition arrears, there is no basis to lift the stay on these grounds given the availability of funds to make these payments. According to the Debtor's testimony, there should be $3,000 income from the Property by now which will enable him to quickly cure the payment defaults.

## II.

■ Finding no basis to lift the stay under § 362(d)(1), I will turn now to the alternative ground for relief sought. Section 362(d)(2) requires the court to grant relief from the stay "with respect to a stay of an act against property" if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The movant has the burden of proof on the issue of the debtor's equity in property and the debtor has the burden of proof on all other issues. 11 U.S.C. § 362(g). Since it is undisputed that there is no equity in the Property, relief will be granted unless the Debtor proves that the property is necessary to an effective reorganization.

■ The United States Supreme Court articulated the standard for measuring whether property is necessary to an effective reorganization in *United Savings Association of Texas v. Timbers of Inwood Forest, supra:*

---

9. As I advised the parties at the hearing, the third reason for cause given, *i.e.*, the bad loan history, is not grounds for relief. If prepetition loan defaults were the basis for relief from stay, the vitality of the stay as a protection to debtors electing to reorganize in bankruptcy would be eviscerated.

10. Adequate protection may be provided in a variety of ways. 11 U.S.C. § 361. Adequate protection may be demonstrated by the existence of an equity cushion. *See In re Mediterranean Associates, L.P.,* 1993 WL 541671 (E.D.Pa.1993); *Commonwealth of Pennsylvania State Employees' Retirement Fund v. Roane,* 14 B.R. 542 (E.D.Pa.1981); *In re Colonial Center, Inc., supra.* Adequate protection may also be provided by the creation of a replacement lien on other, unencumbered property, 11 U.S.C. § 361(2), *In re Ahlers,* 794 F.2d 388, 398 (8th Cir.1986), *rev'd on other grounds,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Antell,* 155 B.R. 921 (Bankr.E.D.Pa.1992); cash payments to the secured creditor, 11 U.S.C. § 361(1), *In re Antell; In re McKillips,* 81 B.R. 454, 458–59 (Bankr.N.D.Ill.1987); or, a viable plan of reorganization which meets the debtor's statutory obligations to the secured creditor, *In re Philadelphia Consumer Discount Co.,* 37 B.R. 946, 949 n. 9 (E.D.Pa.1984); *In re Antell, supra; In re Skipworth,* 69 B.R. 526 (Bankr. E.D.Pa.1987).

What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

484 U.S. at 375–77, 108 S.Ct. 626 (citation omitted; emphasis in original). As our Circuit Court has recognized, the debtor must show that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157 (3d Cir.1993), *reh'g denied, en banc,* February 19, 1993 (*quoting In re 266 Washington Assocs.,* 141 B.R. 275, 281 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992)). While the debtor need not demonstrate that substantial consummation of its plan is guaranteed, a reasonable possibility of a successful reorganization cannot be founded solely on speculation. *In re Dublin Properties,* 12 B.R. 77, 81 (Bankr.E.D.Pa.1981). As has been often stated, proposed plans must be viable to be confirmed in order to prevent the "confirmation of visionary schemes." 5 *Collier on Bankruptcy,* ¶ 1129.02[11] at 1129–59 (15th ed.1994).

According to the Debtor, the income from the Property is necessary to his reorganization. This is apparent since when fully occupied, the Property will generate approximately $1,000 in revenue in excess of its costs, including the Mortgage. However, the Bank contends that its action in enforcing its assignment of rents precludes the Debtor from utilizing those rental proceeds in his reorganization. Presumably relying on the Third Circuit's decision in *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3d Cir.1993),[11] it contends that by reason of its notices to tenants sent prior to the filing of the bankruptcy case, the rents are not property of the Debtor's estate which may be used to fund the Debtor's reorganization plan. The Debtor does not argue with that binding authority but notes that in this case the Bank did not send notices to all the tenants but merely two of the three.[12] As the other three units were vacant at the time, no prepetition enforcement action was taken with respect to them, and of course, none can now be taken given the pendency of the automatic stay. Thus, while the Bank may own certain of the rents under *Mountain View,* at least half of the income from the Property is free of its claim. As to these rents, the Debtor contends he may use the proceeds, which he also believes are not cash collateral, in his reorganization. These conflicting views present the issue for decision, the resolution of which will determine whether the Debtor can effectively reorganize. If the Bank is correct in concluding that the Debtor has no right to use the entire

11. I had asked the parties to brief the effect on Debtor's reorganization of Bank's prepetition notice to less than all of the tenants. While Debtor addressed the issue, Bank filed a brief focusing on the other bases of their case, especially the post-petition payment history. Thus, Bank has never addressed the one issue that was somewhat unique in this case and which prompted my taking this contested matter under advisement. The length of this Opinion is attributed to that issue. Rather Bank's brief attempts to supplement the closed record by attaching an affidavit and additional documents concerning Debtor's post-hearing payment conduct. As parties may not supplement a record by post-trial submissions, I will not consider this material

here. *In re LaBrum & Doak, LLP,* 227 B.R. 391, 398 (Bankr.E.D.Pa.1998).

12. The record is conflicting on whether the Bank served notices on all three tenants. The Bank, while stating that it sent notices to all the existing tenants, did not introduce them. The Debtor testified, without evidentiary objection, that one tenant never received a notice. This sketchy record need not be evaluated further as the result here is the same whether the Bank seized two or three tenant payments. As I find in favor of the Debtor on this issue, I will assume that the Bank gave notice to all existing tenants, and focus on the treatment of rents from subsequent post-petition tenants of the then unoccupied units.

rental stream from the Property, then the Debtor cannot, by his own admission, reorganize in bankruptcy. If, on the other hand, the Debtor can propose a plan that reinstates the Bank's Mortgage with payments to be made from the seized rents and utilizes the rents from new postpetition tenants, to fund other plan obligations, the reorganization may be possible.

■ As is uniformly acknowledged, the treatment of rents in bankruptcy is to be determined by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, the law of Pennsylvania where the Property is located governs this dispute. In Pennsylvania, the treatment of rents is derivative of the legal relationships established under the mortgage.

> In form, a mortgage is certainly a conveyance; but it is unquestionably treated at law here, in the way it is treated in equity elsewhere, as a bare incumbrance, and the accessory of a debt. As between the parties it is a conveyance, so far as is necessary to enforce it as a security: As regards third persons, the mortgagor is the owner, even of the legal estate.

*Bulger v. Wilderman,* 101 Pa.Super. 168, 173 (1930) (internal quotations and citations omitted); *accord Brown ex rel. Par Bond & Mortgage Co. v. Aiken,* 329 Pa. 566, 575, 198 A. 441, 446 (1938); *Randal v. Jersey Mortg. Inv. Co.,* 306 Pa. 1, 158 A. 865 (1932). As the holder of title, a mortgagee is entitled upon default to enter into possession of mortgaged premises, collect the rental value of the land, and retain possession until the mortgage debt is fully paid. *Randal,* 306 Pa. at 1, 158 A. at 865–66; *Bulger,* 101 Pa.Super. at 175. "The right [to possession] is conditional and

[will] cease on payment of the debt, but until paid, the right of possession [is] as real and substantial as if absolute." *Bulger,* 101 Pa.Super. at 176. If there are tenants on the premises when the mortgagee comes into possession and the mortgage contains an assignment of rents,[13] the mortgagee may collect the rents and, subject to making an accounting to the mortgagor, use them to maintain the premises and apply to the debt secured by the mortgage. *Randal,* 306 Pa. at 1, 158 A. at 865–66; *Myers–Macomber Engineers v. M.L.W. Const. Corp.,* 271 Pa.Super. 484, 488–90, 414 A.2d 357, 359–60 (1979); *Colbassani v. Society of Christopher Columbus,* 159 Pa.Super. 414, 416, 48 A.2d 106, 107 (1946); *Miners Sav. Bank v. Thomas,* 140 Pa.Super. 5, 1–12, 12 A.2d 810, 813 (1940); *Bulger,* 101 Pa.Super. at 175–80.

■ Possession can be actual, *i.e.,* physically entry and exercise of dominion over mortgaged premises, *Bulger,* 101 Pa.Super. at 175; *see Peoples–Pittsburgh Trust Co. v. Henshaw,* 141 Pa.Super. 585, 592, 15 A.2d 711, 715–16 (1940); *Fidelity Title & Trust Co. v. Garrett,* 327 Pa. 305, 310, 194 A. 398, 400 (1937), or constructive. A mortgagee is permitted to come into constructive possession of premises by sending notification of the mortgagor's breach to the tenants, informing them of the assignment of rents, and requesting direct payment of the rent to the mortgagee. *Bulger,* 101 Pa.Super. at 176–77; *see Miners Sav. Bank,* 140 Pa.Super. at 10–11, 12 A.2d at 813; *Colbassani,* 159 Pa.Super. at 416, 48 A.2d at 107. The mortgagee is entitled to take legal action against a tenant who does not comply with the request.

■ When a mortgagee does come into possession of real estate, it takes on certain responsibilities to the mortgagor.

---

**13.** The significance of an assignment of rents is to allow the mortgagee to collect rents from a tenant who becomes a lessee following the execution of the mortgage. Rents paid by tenants in place at the date of execution of the mortgage are already deemed to be part of the mortgagee's reversionary interest in the realty, entitling the mortgagee automatically to receive the rents from them upon default. *Fogarty v. Shamokin & Mount Carmel Transit Co.,* 367 Pa. 447, 450–51, 80 A.2d 727, 728–29 (1951). An assignment of rents clause gives the mortgagee the same right with respect to leases entered into subsequent to the mortgage. *See Randal v. Jersey Mortg. Inv. Co.,* 306 Pa. at 1, 158 A. at 865–66.

A mortgagee-in-possession becomes a quasi trustee to the mortgagor, operating the property not only to protect its own interest but also for the benefit of the mortgagor to pay off the debt. *Myers–Macomber Engineers*, 271 Pa.Super. at 488–90, 414 A.2d at 359–60; *Provident Trust Co. v. Judicial Building & Loan Ass'n*, 112 Pa.Super. 352, 355–56, 171 A. 287, 289 (1934). The mortgagee must account for the rents received, applying the proceeds to the upkeep and operation of the premises and then to payment of the debt. *Myers–Macomber Engineers*, 271 Pa.Super. at 488–90, 414 A.2d at 359–60. The law is not clear as to whether an identical set of responsibilities falls upon a mortgagee who assumes only constructive possession of premises. The court in *Zisman v. City of Duquesne*, 143 Pa.Super. 263, 266, 18 A.2d 95, 97 (1941), indicated that actual possession is necessary for a mortgagee to take on the full array of responsibilities assigned to a mortgagee-in-possession. *See also In re Olick*, 221 B.R. 146, 156 (Bankr.E.D.Pa.1998). However, it is certain that a mortgagee in constructive possession of premises assumes at the least a duty to account for the rents to the mortgagor and apply the rents to payment of the debt. *Randal*, 306 Pa. at 1, 158 A. at 866; *Miners Sav. Bank*, 140 Pa.Super. at 10–11, 12 A.2d at 813.

■ Upon full payment of the debt, the mortgagee must relinquish the property to the mortgagor. *Aiken*, 329 Pa. at 575, 198 A. at 445; *Bulger*, 101 Pa.Super. at 175. In this respect, a mortgagor out of possession may be characterized as having a contingent future interest in the return of the premises. *In re Mocco*, 176 B.R. 335, 345 (Bankr.D.N.J.1995). Contingent upon payment, which could occur at anytime if the funds can be raised to pay the debt, the mortgagor may regain possession of the property. *In re Evergreen Memorial Park Association*, 308 F.2d 65, 67 (3d Cir. 1962); *see also* 21 P.S. § 733. The only event that could cut off that right is a transfer of the mortgagor's underlying title, either voluntary or involuntary. *See Elliott v. Moffett*, 365 Pa. 247, 250–54, 74 A.2d 164, 166–68 (1950).

Against the backdrop of this legal landscape, the Third Circuit decided the case of *Commerce Bank v. Mountain View Village, Inc., supra*, in which it addressed the status of assigned rents in bankruptcy under Pennsylvania law. The case involved the owner of an apartment complex who had defaulted on a mortgage. Following the default, the mortgagee, who possessed an assignment of rents clause in its mortgage, attained constructive possession of the complex by notification to the tenants, who thereafter paid rent to the mortgagee. The debtor then filed for protection under Chapter 11 and sought use of the rents, anticipating that the rents would provide funding for its plan.

The Third Circuit held that the rents were not property of the debtor's estate, were not cash collateral, and were not available for use in the debtor's plan. The court reasoned that under Pennsylvania's "title theory" of mortgage law, the rents were the property of the mortgagee. The mortgage functioned as a conveyance to the mortgagee of the subject premises including, upon possession, the right to the rents and was treated as being absolute for as long as the mortgage was in place. The court pointed out that the original recordation of the mortgage constituted the perfection of the mortgagee's interest in the rents by rendering it superior to subsequently recorded liens or transfers and that the act of taking possession of the premises (including constructive possession) constituted the enforcement of the mortgagee's rights against the property.

■ The Third Circuit's opinion supports the inference, however, that rents subject to a valid assignment received during the pre-enforcement period (*i.e.*, before the mortgagee takes constructive possession of the premises by notification to the tenants) should be considered cash collateral under 11 U.S.C. § 363. Before a creditor takes possession of the rents, even

after an event of default has occurs, Pennsylvania law holds that the rents continue under the dominion of the mortgagor to be used at its direction. *Miners Savings Bank,* 140 Pa.Super. at 11–12, 12 A.2d at 813–14. Courts have thus held that under the Bankruptcy Code rents at the pre-enforcement stage should be considered cash collateral, *In re Foxcroft Square Co.,* 178 B.R. 659 (E.D.Pa.1995); *Streiker & Co. v. SeSide Co. (In re SeSide Co.),* 152 B.R. 878 (E.D.Pa.1993), which a debtor may use only upon reaching an agreement with the creditor or after obtaining a court finding that the creditor's interest in the rents is adequately protected. *See* 11 U.S.C. § 363(c)(2)(A) & (B).

With these principles in mind, I am ready to address the use of the rents in the present case. First, I believe the law allows the Debtor leeway to draft a plan that takes account of the present use of the rents by the mortgagee-in-possession to amortize the balance owing on the mortgage. In the few instances in which courts have directly addressed the issue, they have held that debtors may not use assigned rents to "fund a plan" of reorganization because the money is not part of the bankruptcy estate. While the cases do not articulate what is meant by stating that the rents may not be used to "fund a plan," the context of the opinions makes clear that the debtors intended to use the assigned rents to meet the their obligations generally under a plan, including the payment of expenses and claims other than those of the mortgagee. It is possible, however, to envision a plan in which assigned rents occupy a narrower role. One example of such a plan, and the only one I could find in a reported case, is discussed in *In re Galvin,* 120 B.R. 767 (Bankr.D.Vt.1990), where the court confirmed a Chapter 13 plan that, as described by the court, provided for a deduction from the debtor's monthly mortgage payment of an amount equal to the monthly rental received by the debtor's mortgagee under an assignment of rents. The court's analysis of the plan was brief:

Although we conclude Bank [the mortgagee] was and is entitled to collect rent directly from Debtors' Tenant and the rent is not property of Debtors' estate, we nevertheless conclude Debtors' plan properly deducted the amount collected by Bank because the attornment of rent to Bank renders Bank liable to account to Debtors until foreclosure and expiration of Debtors' equity of redemption.

*Id.* at 772. Thus, the court approved the plan because it did not interfere with the mortgagee's collection and possession of the assigned rents, but at the same time gave credit for the mortgagee's actions by recognizing that the rents must be used to pay down the creditor's claim.

Implicit in the *Galvin* court's decision is recognition of a distinction between plan provisions that modify the nature and scope of the creditor's interest in rents and provisions that modify creditors' rights relating to the terms of repayment. Courts find it objectionable to allow use of seized rents to "fund a plan" because such a plan treats the rents as if they were the property of the debtor instead of the mortgagee. A plan of this type has the effect of modifying the nature of the creditor's interest in the rents from that of ownership to that of security. While modification of the creditor's state law property interest in the rents in such a fashion is impermissible, the Bankruptcy Code otherwise allows debtors to modify the terms of their obligations to creditors. Under §§ 1123(b)(1) and (b)(5), a claim can be impaired and the rights of creditors may be modified. 11 U.S.C. §§ 1123(b)(1) & (b)(5). In addition, § 1129(b)(2) specifically states that it is fair and equitable for a secured creditor to be paid in deferred cash payments if the creditor is able to retain its liens in the collateral and receive present value. 11 U.S.C. § 1129(b). Thus, a plan that accounts for a creditor's use of the rents by providing for a credit against the creditor's claim may be permissible depending upon whether the rate of repayment is fair and

equitable. A plan provision along these lines also has the benefit of being in harmony with state law that requires mortgagees to account for rents and apply them against the mortgage debt. *Myers–Macomber Engineers*, 271 Pa.Super. at 488–90, 414 A.2d at 359–60. There are, of course, many hurdles on the road to confirmation of a Chapter 11 plan, but a plan provision that credits the collection of rents seized by a mortgagee prepetition should not be viewed as an insurmountable barrier to confirmation because such rents are no longer property of the estate.

 The related issue presented by this contested matter is whether the Debtor can utilize the new tenants' rents received and to be received post-petition notwithstanding the transmittal of notices to pre-petition tenants in other units. Analysis of this issue begins with the principle that enforcement of a rent assignment hinges upon possession of the property. *Fidelity Title & Trust Co. v. Garrett*, 327 Pa. 305, 310, 194 A. 398, 400 (1937); *Peoples–Pittsburgh Trust Co. v. Henshaw*, 141 Pa.Super. 585, 592, 15 A.2d 711, 715–16 (1940); *Bulger*, 101 Pa.Super. at 176–77. A mortgagee with an assignment of rents who gains actual possession of the real estate is entitled to collect the rents from all tenants on the premises including tenants who become lessees following the mortgagee's assumption of possession. *Randal*, 306 Pa. at 1, 158 A. at 865–66; *Bulger*, 101 Pa.Super. at 176–77. Indeed, where a mortgagee assumes actual possession of premises the debtor would not even be in a position to enter into leases with new tenants because the debtor would be out of the property.

 By contrast, the mortgagee in the present case did not take actual possession of the premises. The Bank opted instead to take constructive possession by sending notification of the assignment to the tenants then in place and requesting direct payment of the rents. Consequently, the Debtor remained in actual physical possession of the property and retained the ability to lease units to new tenants. Ordinarily, outside of bankruptcy, it would be fruitless for a debtor to enter into new leases because there would be nothing to prevent the mortgagee from sending notification of the rent assignment to the new tenants and gain constructive possession of their units as well. In this case, however, the intervention of bankruptcy leads to a different result. Following the bankruptcy filing, the automatic stay, 11 U.S.C. § 362(a), came into play to enjoin the Bank from further action to enforce its rent assignment against the Debtor or his property. The Bank is thus prohibited, without obtaining relief from the stay, from sending notification of the assignment to new tenants and assuming constructive possession of their units.

 For that reason, rents paid under postpetition leases are not the property of the Bank pursuant to the assignment of rents. However, that conclusion does not provide a complete answer to the question of whether the Debtor is entitled to use the rents himself. In *Mountain View Village*, 5 F.3d at 39, the Third Circuit noted that an interest in rents is perfected by the recordation of an assignment and enforced by taking possession of the property. *Id.* Applying that decision, district and bankruptcy courts have thus concluded that rents paid in the interim period between perfection and enforcement become cash collateral in bankruptcy. *Foxcroft Square Co.*, 178 B.R. at 659; *SeSide*, 152 B.R. at 878. Pursuant to section 363(c)(2)(A) & (B), a debtor may only use cash collateral with the consent of the creditor or the approval of the bankruptcy court based on a determination that the creditor's interest is adequately protected.

The record of this hearing evidences the Bank's recordation of its mortgage and assignment of rents on August 13, 1997, thereby perfecting its interest in the rents prior to filing of the bankruptcy case. Exhibit C–1. Under the foregoing authority, rents paid under postpetition leases are

795

cash collateral contrary to the Debtor's view. To utilize the rents during this Chapter 11 proceeding, the Debtor must obtain authorization in accordance with § 363(c)(2)(A) & (B), which is ultimately dependent upon whether the creditor's interest in the rents is adequately protected. Based on the Debtor's projections of new tenancies anticipated by July, he should be receiving rents of this character now. Presumably because of his erroneous belief that these rents are not cash collateral, no motion for authority to use them has been filed. He will be directed to correct that omission immediately. However, the characterization of these rents as cash collateral does not obviate their availability to be used to fund a plan of reorganization so long as the secured creditor's claim is otherwise treated in accordance with § 1129 of the Code. *In re James Wilson Associates,* 965 F.2d 160, 171–72 (7th Cir.1992); *In re Dindiyal,* 1993 WL 540373 *7–8 (E.D.N.Y. Sept. 30, 1993) *In re Coventry Commons Associates,* 149 B.R. 109, 114 (Bankr.E.D.Mich.1992).

## CONCLUSION

A bankruptcy court should be reluctant to deprive a debtor of the benefits of Chapter 11 relief before it has an adequate opportunity to utilize its rehabilitative features. This case is admittedly in its early stages. The Debtor's plan of reorganization has yet to be filed. Where the reorganization appears futile, the Court should intercede at the request of a creditor to prevent further harm. However, at this juncture I can neither conclude that the reorganization is futile nor that the continuation of the stay will cause further harm to Bank *provided* the Debtor continues to make current post-petition mortgage payments. Accordingly, the Motion will be denied.

The Debtor has agreed to file his plan by July 31, 1999 and will be held to that date. As part of the disclosure required to accompany the plan, he will be expected to demonstrate by hard numbers how he will be utilizing these rents to fund a confirma-

ble plan. While I am prepared to accept his concept of a reorganization at this juncture, much more will soon be required of him. I am confident that the Bank will closely monitor the Debtor's performance of his obligations to it as well as his progress towards promulgation of a feasible plan of reorganization, reviewing current operating statements to test the Debtor's projections of new tenancies with actual income and the terms of the plan that will soon be filed to ascertain whether there is a viable reorganization in progress. Evidence to the contrary presumably will be the basis for renewed action by the Bank.